UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

Susan Hoy,

Plaintiff

v.

Andrea Hernandez, et al.,

Defendants

Case No. 2:20-cv-00103-CDS-VCF

Order Granting in Part and Denying in Part the Defendants' Motions for Summary Judgment and Striking the Joinders to those Motions

[ECF Nos. 90, 91, 97, 98]

This is a civil-rights action brought by plaintiff Susan Hoy, guardian ad litem for J.M. and I.M., two minor children who suffered severe injuries while in the care of their former foster parents, defendants Andrea and Waldo Hernandez. Hoy also sues Clark County and various employees of the county's Division of Family Services (DFS) for their alleged failure to stop the Hernandezes' abuse of J.M. and I.M. The defendants each move for summary judgment. Because Hoy does not assert any plausible claim for relief against two of the county employees—Lisa Ruiz-Lee and Paula Hammack—I sua sponte dismiss them from this case. I also find that Kim Kallas is entitled to qualified immunity and thus grant summary judgment in her favor on the claims asserted against her. But I find that Hoy has presented genuine issues of material fact as to certain claims she brings against Lisa Brochu, Clark County, and the Hernandezes. This case will thus proceed to settlement and, if the remaining parties fail to settle, trial.

I.   **Background**

   *a.   J.M. joined the Hernandez household.*

   The Hernandez household contained—at various times—the Hernandezes, three biological children, and a few foster children. Child Protective Services (CPS) Report, ECF No. 93 at 15. Some of those foster children were removed from the Hernandezes' care due to allegations of physical abuse or neglect. *Id.* at 17–18. DFS investigated the household in 2010 and

determined that the Hernandezes violated two Nevada administrative codes pertaining to their foster home license—they left hazardous construction materials in their backyard and kept too many dogs in the house—but permitted them to correct those violations. Licensing Investigation Report, ECF No. 127 at 2. Such was the state of affairs at the home when baby J.M. arrived.

J.M. was born on April 10, 2012, and placed in the Hernandez foster home ten days later. ECF No. 93 at 12, 81. He was one of several children under the Hernandezes' care during 2012. In December 2012, an elementary school counselor to one of the Hernandezes' other foster children called CPS, a division of DFS, to report that the child "comes to school dirty with double[-]soiled diapers and dressed in ill[-]fitting and dirty clothes" and was habitually tardy or absent. DFS Notes, ECF No. 131 at 20–21. She added that "there was a second diaper on top of the soiled diaper and that this led her to believe that the foster parent was simply putting a new diaper on top of the old diaper." *Id.* at 23. The very next day, DFS investigated by visiting the Hernandezes unannounced. *Id.* at 23. Andrea justified the double-diapering as necessary because a school-bus came for the child just as she soiled herself. *Id.* The DFS investigator "left the Hernandez[es] with a business card and decided to make another visit to the school after Christmas break." *Id.* at 24. Before DFS could complete that second visit, Andrea withdrew that child from the school and requested on January 12, 2013, that she and all of the other foster children at her house— except for J.M., whom she planned to adopt—be removed from her home as they were "getting to be too much." Case Notes, ECF No. 132 at 18.

A DFS investigator then checked on the foster children in the Hernandezes' care again on January 14, 2013, when she observed that the three foster children whom Andrea had requested be removed had unprofessional haircuts, bruising, and diaper rash. *Id.* at 25. Andrea "stated that [the] female child . . . hit herself on the bed" but "offered no explanation for the other children." *Id.* The investigator then spoke with defendant Lisa Brochu, the DFS caseworker assigned to J.M. *Id.* at 25–26. Brochu stated that she had never seen anything unacceptable at the

Hernandezes' residence and that the Hernandezes always "have a reasonable explanation" for the marks or bruising on their children. *Id.* at 26. The investigation fizzled out, as the children were non-verbal and could not be interviewed. *Id.* at 27. Eventually, the three foster children living at the Hernandezes—other than J.M.—were moved to different homes, and the case was closed as unsubstantiated. ECF No. 132 at 22.

  *b. The Hernandezes neglected J.M., then agreed to foster I.M.*

  In June 2013, Andrea brought her three biological children and J.M. to her family's second property, described as the "ranch in Sandy Valley." Andrea Decl., ECF No. 134 at 55:10–11. The Hernandezes moved into a trailer on the ranch without first obtaining licensing for approval from DFS. ECF No. 132 at 28. At the Sandy Valley location, Andrea frequently left her 13-year-old autistic son in charge of J.M. and I.M "for up to 4 hours at a time." ECF No. 132 at 52. Sometime in the first week of June, the 13-year-old placed J.M. on top of a stainless-steel refrigerator located outdoors on a one-hundred-degree day, to change his diaper. ECF No. 134 at 55:15–17; ECF No. 132 at 52. J.M. suffered severe "second and possibly third[-]degree burns (hard to tell due to the age and healing process)" on his buttocks and arm. ECF No. 132 at 52; ECF No. 143-2 at 8, 27–29, 42–43 (photos of the burns taken in September demonstrating the severity of the injuries). Andrea did not report the injuries to DFS because she was "afraid . . . of losing [J.M.]" and feared that her "son would be blamed." ECF No. 134 at 60. Andrea "lied to [DFS] about [J.M.'s] living conditions and about the care of the children to include medical appointments that were never made." ECF No. 132 at 52. The Hernandezes "covered up the burns [on J.M.] by having him wear long[-]sleeved shirts to visits or they wouldn't bring him to visits at all." *Id.* And Andrea "lied about the burns on his buttocks [as] being due to a rash when asked about them at visitation in August 2013." *Id.* Another of Andrea's children stated "[t]hat her mom got really mad and took the whip and whipped" the 13-year-old for burning J.M. ECF No. 132 at 28. The incident and subsequent lack of treatment resulted in J.M. having emotional meltdowns at subsequent diaper changes. ECF No. 132 at 52. Brochu visited the Hernandezes shortly

thereafter; she stated that she observed J.M. in a diaper and t-shirt on July 8, 2013. ECF No. 128 at 311. She also stated she that observed Andrea change J.M.'s diaper and noted "no marks or bruises." *Id.* But Andrea alleges that, after J.M. was burned, Brochu never inspected his bottom or forearm. ECF No. 134 at 67–68. She states that if Brochu had looked for the injuries, she would have found them. *Id.*

In mid-August, Andrea reached out to Brochu and attempted to terminate her status as a foster parent. ECF No. 131 at 30. Andrea stated that she disliked being at the "mercy of a broken system treating [the Hernandezes] like second class citizens," being warned about the weight of her children or the cleanliness of her house, and that the social workers were "dangling baby [J.M.] over her head" and treating her "as if she [were] a criminal." *Id.* Nevertheless, Brochu spoke with Andrea and convinced her not only to retain J.M. but also to get licensed to foster J.M.'s recently born brother, I.M. *Id.* I.M. was born on July 26, 2013, and he was placed with the Hernandezes on August 22, 2013. ECF No. 93 at 92.

A safety check of the Hernandezes' home on August 27, 2013, performed by a different DFS caseworker, revealed that I.M. demonstrated signs of drug withdrawal at birth. ECF No. 144-13 at 122. The caseworker recommended Andrea follow up with a doctor and the hospital at which I.M. was born. *Id.* During this encounter, Andrea misrepresented that she was in the process of licensing the Sandy Valley home for the two foster children. ECF No. 128 at 328–29. But Andrea never licensed the Sandy Valley home, nor did she take I.M. to a doctor.

    *c.   J.M. and I.M.'s mother pressured CPS to investigate.*

Later that day, J.M. and I.M. visited their biological mother and grandmother at the foster visitation center. *Id.* at 329. Their mother expressed concern about J.M.'s buttocks, which "showed an outline of splotchy, discolored skin." *Id.* The following day, their mother called DFS to speak with Brochu's supervisor—defendant Kim Kallas—and reiterate her concerns. *Id.* at 330. Kallas called Andrea two days later, who reported that J.M. had diaper rash and probably got the mark playing on a Slip and Slide. *Id.* at 331. Kallas thus instructed her to take J.M. to the

doctor. *Id.* The boys' mother called DFS a few times for further explanation, but Kallas referred her to call the CPS hotline if she wanted to lodge a formal complaint. *Id.* at 332–33. She did so on September 4, 2013, and reported that (1) the explanation of "diaper rash" for J.M.'s burns seemed inconsistent with what she had observed, (2) Andrea had still failed to provide any documentation indicating that J.M. had seen a medical doctor, (3) I.M.'s body was "dirty" and his baby bottle "filthy and brown in color," and (4) Andrea kept stating that she was sick, which prevented scheduled visitation days between J.M. and his mother. CPS Report, ECF No. 143-2 at 54–55. She specifically requested for "CPS to check on the home and make sure that the children are being bathed, fed[,] and taken care of." *Id.* at 55–56.

On September 9, a DFS employee conducted a home visit for I.M. and performed a body check, observing that he seemed well. ECF No. 128 at 335. She did not see J.M. *Id.* By September 17, the boys' mother again called the CPS hotline, worried because Andrea had canceled both planned visits since she had last seen the boys. ECF No. 143-2 at 48. She expressed heightened concern regarding her children's well-being. *Id.* CPS escalated her report to Licensing for further review. *Id.* at 49. A DFS employee thus performed an unannounced visit to the Hernandezes' Las Vegas home on September 19, but nobody was there. ECF No. 143-1 at 197. She took photos of the house and left her business card. *Id.*; ECF No. 143-3 at 44–45 (photos).

On September 23, two DFS employees performed an unannounced visit to the Hernandezes' Sandy Valley home. ECF No. 143-1 at 198; ECF No. 143-2 at 30–41 (photos). They noted a van parked next to a motor home with an adjacent door and, believing somebody was inside, honked their car horn to prompt someone to exit the home and open the gate to the property. ECF No. 143-1 at 198. Nothing happened. *Id.* They called their supervisor to relay their findings and were instructed to enter the property immediately to locate and remove J.M. and I.M. *Id.* As they moved toward the gate, Andrea revealed herself from the motor home to meet them. *Id.* When the social workers asked her why she was unresponsive, Andrea stated that she was switching phone carriers. *Id.* They asked Andrea how long she had been living in Sandy

Valley. *Id.* Andrea responded that the Hernandezes were not living there, and she became
argumentative. *Id.* She added, "[t]ake the children. Just take them. Do you need car seats? Just
pull up your car and take them. It's embarrassing to have your car here and all the neighbors are
probably watching. Just take them. I will relinquish them to you! You cannot come into the
camper!" *Id.* The workers then opened the gate, drove near the motor home, and received J.M.
and I.M. from Andrea. *Id.* at 198–99. They noted that both children were "very dirty" and
"smelled." *Id.* at 199. They also noted that I.M. seemed to have a dry scalp, possibly "cradle cap."
*Id.* The next day, after the "filth that was present upon [their] arrival had been cleaned," a DFS
employee observed the children to document their injuries. ECF No. 132 at 25. I.M., even after he
had been cleaned up, had yeast under his neck and both armpits, severe diaper rash, blistering
and peeling skin, and a thick layer of cradle cap. *Id.* J.M. had two partially healed burn marks on
his right buttock and right arm, an abrasion on his abdomen, and matted hair. *Id.* Both children
sounded congested and had nose mucus. *Id.* The caseworker discovered that I.M. had not been to
a pediatrician since birth, that J.M. had not been seen by a doctor since March 2013, and that
J.M.'s burns had never been treated. *Id.* at 26. She thus called a member of the Las Vegas
Metropolitan Police Department (LVMPD) to take photos and investigate further. *Id.*

On October 11, two LVMPD specialists and Dr. Sandra Cetl, a pediatrician with expertise
in child abuse and neglect, met with a DFS employee to discuss the circumstances surrounding
J.M. and I.M.'s treatment. *Id.* at 44. Dr. Cetl stated that it was difficult to assess the severity of
the injuries months after they occurred but noted that J.M. would have been in excruciating
pain at the time of the burn incident. *Id.* She added that the mark on J.M.'s abdomen was contact
dermatitis and attributed it to poor hygiene. *Id.* As for I.M., she diagnosed him with severe
dermatitis attributable to poor hygiene and remarked that any reasonable person would seek
care or medical advice based on the amount of skin breakdown on I.M.'s body. *Id.* She concluded
that the children were neglected, indicating "seriously or consistently inadequate care of child"
and further marked J.M. as "definite[ly] abuse[d]." *Id.* at 53. The Hernandezes' biological children

stated that their parents attempted to find burn treatment information on the internet, and Andrea stated that she concealed the burns to avoid her son getting in trouble. *Id.*

    *d.   DFS investigated Brochu.*

Under DFS policy, Brochu should have performed out-of-home safety checks on J.M. in April and July 2013. DFS Investigation Report, ECF No. 135 at 5. Such checks are required every three months, and Brochu's failure to perform them "resulted in safety threats and injuries" to J.M. "not being identified." *Id.* The DFS investigation revealed that Brochu failed to take any steps to ensure that the medical well-being of J.M. was not in question and that his immunizations were up to date. *Id.* It concluded that her "negligence with respect to [her] duties" as a Senior Family Services Specialist with DFS "ultimately failed to protect a vulnerable child, and protect his safety, permanency, and well-being while in DFS custody." *Id.* DFS thus placed Brochu on administrative leave on October 11, 2013, and eventually terminated her. *Id.* at 6, 9.

    *e.   Hoy sued the defendants.*

Hoy now asserts four claims: (1) civil rights violations brought under 42 U.S.C. § 1983 against Brochu, Kallas, Lisa Ruiz-Lee, Paula Hammack, and Clark County;[1] (2) inadequate training brought under 42 U.S.C. § 1983 against Ruiz-Lee, Hammack, and Clark County; (3) negligence against Brochu, Kallas, and Clark County; and (4) negligence against the Hernandezes. Compl., ECF No. 1-2 at ¶¶ 52–82. Brochu defends herself separately and moves for summary judgment. ECF No. 90. Kallas, Ruiz-Lee, Hammack, and Clark County also collectively move for summary judgment. ECF No. 91. The Hernandezes do not themselves move for summary judgment, but they joined the other two motions for summary judgment. ECF Nos. 97, 98.

---

[1] Hoy also asserted this claim against Anita Moody but has since stipulated to dismiss her from this case. ECF No. 29.

## II.   Standard for summary judgment

Rule 56(c) provides that summary judgment be granted where there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must not make credibility determinations or weigh conflicting evidence. *Id.* at 255. Rather, the court must view the evidence in the light most favorable to the non-moving party, drawing all "justifiable inferences" in its favor. *Id.* (internal citation omitted. The movant bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the moving party has met its burden of production, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. *Id.* If the nonmoving party fails to produce enough evidence to show a genuine issue of material fact, the moving party wins. *Id.* Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## III.   Brochu's motion for summary judgment (ECF No. 90)

Hoy asserts two claims against Brochu: (1) a substantive-due-process claim under the Fourteenth Amendment, and (2) a state-law negligence claim. ECF No. 1-2 at ¶¶ 52–80. Brochu argues that she is entitled to qualified immunity from the former and discretionary immunity from the latter. ECF No. 90 at 7–12, 14–16. She adds that, even if she does not enjoy either immunity, there is no evidence that she engaged in any conduct violating the Fourteenth Amendment and that the Hernandezes' actions were an intervening cause of J.M.'s injuries such that she was not negligent. *Id.* at 13–14.

*a.   I deny Brochu qualified immunity from Hoy's Fourteenth Amendment claim.*

As Brochu points out, ECF No. 118 at 7 n.3, Hoy's response (at least partially) "conflates qualified immunity for the federal [] claim" with "discretionary immunity for the state claim." *Id.* This is evidenced by Hoy's argument that "qualified immunity does not apply" because Brochu's actions were "not discretionary." ECF No. 110 at 25 (citing various Nevada cases discussing discretionary-act immunity). However, Hoy addresses the appropriate standard thereafter. *Id.* at 27–29.

First, I note that discretion is not an element of a qualified-immunity defense; rather, the doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Determining whether an official should be granted qualified immunity thus requires two inquiries, neither of which need be resolved by the discretionary nature of a defendant's actions. Instead, a court must determine (1) whether the defendant violated a federal constitutional or statutory right, and (2) whether that right was "clearly established" at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). "Lower courts have discretion to decide which of the two prongs . . . to tackle first." *Id.*

*1.   Violation of a constitutional right.*

I first find that J.M. had a clearly established right under the Fourteenth Amendment, to state protection while he was in the care of the state (*i.e.*, in foster care), and that the contours of this right were well-known to Brochu at the time of the conduct in question. While the Fourteenth Amendment typically "does not impose a duty on government officers to protect individuals from third parties," *Morgan v. Gonzales*, 495 F.3d 1084, 1093 (9th Cir. 2007), two exceptions to this general rule apply: the "special relationship" exception and the "state-created danger exception." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011). The Ninth Circuit has identified that the "special relationship doctrine applies to children in foster care." *Henry A. v.*

*Willden*, 678 F.3d 991, 1000 (9th Cir. 2012). This is because once "the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child." *Lipscomb v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992). Accordingly, J.M. and I.M. held protected liberty interests in being shielded from harm inflicted by a foster parent and enjoyed a special relationship with the state once they were placed in foster care. *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 842 (9th Cir. 2010). And "that duty is the quintessential responsibility of the social workers assigned to safeguard the well-being of this helpless and vulnerable population." *Id.* at 843.

But for a breach of that duty to rise to a violation of substantive due process, a state official must "act with such deliberate indifference to [the children's] liberty interest that their actions 'shock the conscience.'" *Id.* at 844 (quoting *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006)). Conduct that "shocks the conscience" is "deliberate indifference to a known[—]or so obvious as to imply knowledge of[—]danger." *Id.* (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1064 (9th Cir. 2006)). This standard "requires a showing of an objectively substantial risk of harm and a showing that the officials were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and that either the official actually drew that inference or that a reasonable official would have been compelled to draw that inference." *Id.* at 845. The "subjective component may be inferred 'from the fact that the risk of harm is obvious.'" *Id.* (quoting *Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regul. Servs.*, 380 F.3d 872, 881 (5th Cir. 2004)).

J.M. faced an objectively substantial risk of harm and Brochu was—or should have been—subjectively aware of that fact because the risk of harm was obvious. Brochu argues that she was not aware of danger facing J.M. ECF No. 90 at 10–12. Hoy offers rebuttal testimony from Edward Cotton, a child-welfare consultant, former administrator at Nevada DFS and its New

Jersey analogue, and foster parent himself.[2] ECF No. 136 at 2–3. He describes Brochu's failure to oversee J.M.'s wellbeing and identifies specific home visits wherein Brochu should have taken more care to ensure that J.M. was unharmed. *Id.* at 28–30. He notes that Brochu failed to follow DFS policy regarding "out of home safety placement checks," that her failure "resulted in [J.M.] suffering months of severe pain," and that "[h]er statements that she conducted body checks on [J.M.] every time she was in the home are [in]consistent with all other evidence in the case." *Id.* at 30. While Andrea may have had, in Brochu's words, "reasonable explanations" for any single one of the marks, bruises, and injuries on J.M., the totality of injuries inflicted on the child should have raised Brochu's awareness to the need for further investigation. *Id.* at 32.

Brochu argues that Andrea "actively conceal[ed]" the burns from her and DFS. ECF No. 90 at 10. But that statement is belied by her own case notes. It is unclear how Brochu noted "no marks or bruises" during her visit to the Hernandezes in early July, shortly after the burning incident in early June.[3] ECF No. 128 at 311. Those marks lingered such that J.M.'s mother identified them in late August, and they are also clearly visible in the photographs taken months later, in September. ECF No. 143-2 at 43. Frankly, the pictures are worth thousands of words here: it is inconceivable that any reasonable social worker doing their job could identify "no marks or bruises" on J.M. *Id.*; ECF No. 136 at 29. While Andrea testified that she took measures to hide J.M.'s injuries, she also testified that Brochu would have found those injuries if she had

---

[2] Clark County and the other DFS defendants object to any consideration of Cotton's report—both substantively and with respect to its form. ECF No. 122 at 2–3. I agree that an expert's legal argument holds no weight at the summary-judgment stage, and I disregard his testimony insofar as he analyzes case law, identifies that certain behavior falls within specific legal standards, and couches conclusions of law as findings of fact. But courts may consider evidence at the summary-judgment stage whose form renders it inadmissible so long as the underlying evidence could be provided in an admissible form at trial. *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016). I thus consider only Cotton's opinion testimony as it pertains to the procedure that DFS employees should have followed and his factual findings that are based on evidence reproduced elsewhere in the record.

[3] Brochu also noted "no marks or bruises" following her June 12 visit. ECF No. 128 at 304. Andrea states that J.M. was burned during the first week of June. ECF No. 134 at 55. Because there seems to be some uncertainty as to whether the burns actually occurred at that time, ECF No. 136 at 28–29, it is possible that Brochu's June 12 visit nonetheless occurred before J.M. was burned. But no party disputes that the burns occurred before Brochu's visit in July.

looked for them. ECF No. 134 at 60, 67–68. In fact, Brochu specifically reported that during her July visit, "Andrea changed [his] diaper and he had no marks or bruises." ECF No. 128 at 311. Brochu thus either watched the diaper change and somehow missed the severe burns or misrepresented watching the diaper change and neglected to check for injury.

And the July visit is not the only instance during which Brochu failed to identify any injuries on J.M. She visited him again at the Hernandezes on August 8, 2013, when she noted that J.M. "was only wearing [a] diaper[.]" ECF No. 128 at 319. Here, too, Brochu reported that J.M. "looked well, had good color[,] and had no unusual marks or bruises." *Id.* Brochu's failure to identify clear burn marks on J.M.'s arm and buttock—when a reasonable case worker would have been compelled to draw the inference of a subjective risk of harm—rises to the standard required for deliberate indifference. The burns constitute an objective risk of harm. Consequently, Hoy could persuade a jury that Brochu acted with clear deliberate indifference to J.M.'s wellbeing.

### 2. *Clearly established right.*

The second prong of the qualified-immunity analysis is to determine whether J.M. and I.M.'s constitutional rights were clearly established. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. This inquiry is 'wholly objective.'" *Tamas*, 630 F.3d at 846 (internal quotation marks and citations omitted). Based on *Tamas*, issued December 22, 2010, it was "clearly established" that J.M. and I.M. had a protected liberty interest in safe foster care placement once the state assumed control over their wellbeing. *Id.* at 847.

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Brochu's actions demonstrate plain incompetence in her field. ECF No. 136 at 29; *see also J.M.M. v. Hernandez*, 151 F. Supp. 3d 1125 (D. Nev. 2015) (arriving at the same conclusion, albeit on a slightly different procedural posture

with a less-developed record). Because I find that there is a genuine dispute as to whether Brochu violated J.M.'s constitutional right to substantive due process and that the right was clearly established at all times relevant to this suit, I deny Brochu qualified immunity.

      *b.*   *I deny Brochu summary judgment on Hoy's Fourteenth Amendment claim.*

Brochu also argues that even if she is not entitled to qualified immunity, no genuine issue of material fact exists to support her liability under Hoy's substantive-due-process claim. ECF No. 90 at 13. She asserts that the factual allegations against her "essentially amount to a lack of discovery of [J.M.'s] injuries" "due to a missing or insufficient body check." *Id.* She concludes that "there is simply no conduct on [her part] that by any stretch could be considered to be conscience[-]shocking." *Id.* I disagree; my conscience is quite shocked by the evidence revealing this social worker's carelessness when inspecting a one-year-old child in the custody of a foster parent who was the subject of multiple complaints and allegations of abuse. Brochu could have detected the burns on J.M. within weeks after they occurred, had she exercised any sort of diligence during her mandatory visits of the Hernandezes home. ECF No. 136 at 77. Her statements that she conducted body checks every time she visited J.M. and her conclusion that he "looked well" could potentially constitute a misrepresentation, obliviousness, or something more nefarious. Brochu, "to this day, believe[s] that the decision [she] made that [J.M. and I.M.] were safe was correct." Brochu Dep., ECF No. 139 at 67. J.M., who still suffers from severe scarring, developmental delays, and restricted movement, ECF No. 136 at 82, might disagree. "Summary judgment in favor of the defendants is improper unless, viewing the evidence in the light most favorable to the plaintiffs, it is clear that no reasonable jury could conclude that the plaintiffs' constitutional rights were violated." *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000). Viewing the evidence in the light most favorable to Hoy, I find that a reasonable jury could conclude that J.M.'s constitutional right to substantive due process was violated. I thus deny Brochu summary judgment on Hoy's Fourteenth Amendment claim.

1     *c.   I grant Brochu summary judgment on Hoy's negligence claim.*

2          In order for Hoy to prove her negligence claim, she must demonstrate that: (1) Brochu

3    owed a duty of care to J.M. and I.M., (2) Brochu breached that duty, (3) the breach was the legal

4    cause of the children's injuries, and (4) the children suffered damages. *Momox-Caselis v. Donohue*,

5    987 F.3d 835, 847 (9th Cir. 2021) (citing *Scialabba v. Brandise Const. Co., Inc.*, 921 P.2d 928 (Nev.

6    1996)). As a matter of law, Brochu's actions cannot be the cause of the children's injuries because

7    the Hernandezes' actions were a superseding cause and were unforeseeable to Brochu. *See id.*

8    (holding that a negligence claim fails where the nonmoving party failed to sufficiently

9    demonstrate the existence of causation in light of an intervening cause); *Bower v. Harrah's Laughlin*,

10   *Inc.*, 215 P.3d 709 (Nev. 2009) (holding that an originally negligent party is only liable for a third

11   party's intentional tort or crime if it was foreseeable). Stated differently, "unlawful conduct can

12   interrupt or supersede the causation between a negligent act and an injury" but "an unlawful act

13   will not supersede causation if it was foreseeable." *Anderson v. Mandalay Corp.*, 358 P.3d 242, 248

14   (Nev. 2015).

15         Andrea Hernandez, by entrusting a 13-year-old child with the supervisory care of a one-

16   year-old, created the situation in which J.M. was burned. ECF No. 90-3 at 5:10–7:13. Andrea's

17   son, by placing J.M. on the refrigerator sitting outdoors in 100-degree sunlight, contributed to

18   that situation. *Id.* It was not foreseeable to Brochu that Andrea would entrust her foster child to

19   her son, nor was it foreseeable that Andrea's son would attempt to change a one-year-old's

20   diaper outdoors on a superheated piece of metal. Hoy does not genuinely dispute that Brochu

21   had nothing to do with J.M.'s placement at the Hernandezes, so Brochu could not have been

22   negligent in the initial placement of J.M., either.

23         Brochu may have failed to identify the injuries after they occurred, but I could find no

24   indication in the record or in Hoy's briefing that indicates she should have foreseen a risk of J.M.

25   being burned due to reckless diaper changing by Andrea's son. Hoy argues that "there is

26   substantial evidence to suggest that the danger . . . was foreseeable" but does not cite to any

14

portion of the record in her discussion of foreseeability, nor does she attempt to distinguish the facts at hand from the facts of *Momox-Caselis*. 987 F.3d 835. Because Hoy has failed to meet her burden in demonstrating causation, I must grant Brochu summary judgment on the negligence claim asserted against her. *See Celotex*, 477 U.S. at 323 (holding that there cannot be a genuine issue of material fact where the nonmoving party fails to make a sufficient showing to establish the existence of an essential element of their cause of action).

**IV.   Clark County, Kallas, Ruiz-Lee, and Hammack's Motion for Summary Judgment (ECF No. 91)**

Hoy asserts three causes of action against Clark County: (1) a Fourteenth Amendment claim for failing to supervise and protect J.M. and I.M., (2) an inadequate training claim, and (3) a state-law negligence claim. ECF No. 1-2 at 12–16. She asserts the Fourteenth Amendment and inadequate training claims against Ruiz-Lee and Hammack, and the Fourteenth Amendment and negligence claims against Kallas. *Id.* The three individual defendants argue that they are entitled to qualified immunity and discretionary immunity. Both the county and the individual defendants also argue that they are entitled to summary judgment, which Hoy opposes.

*a.   I sua sponte dismiss all of Hoy's claims against Ruiz-Lee and Hammack.*

Hoy lumps together all three DFS defendants in arguing that they should be held liable. *See generally* ECF No. 109. She argues that they were each involved in the hiring, training, and supervision of county employees. *Id.* at 27. Ruiz-Lee was the director of DFS, Hammack was the direct supervisor of Kallas, and Kallas was the direct supervisor of Brochu. *Id.* at 27–28. But Hoy does not allege in the complaint—nor does she identify in her opposition to the defendants' motion—a single fact related to either Ruiz-Lee or Hammack's personal involvement in the events underlying this suit. *See generally* ECF Nos. 1-2, 109. Their names arise only when Hoy recites the elements of her causes of action. "A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) [their] personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct

1  and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting

2  *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)); *Taylor v. List*, 880 F.3d 1040, 1045 (9th Cir.

3  1989) ("A supervisor is only liable for constitutional violations of [their] subordinates if the

4  supervisor participated in or directed the violations, or knew of the violations and failed to

5  prevent them."). Hoy does not present any evidence, nor did I find any within the record,

6  suggesting that Ruiz-Lee or Hammack participated in any constitutional violations or that they

7  knew of and failed to prevent any such violations. Because conclusory allegations against

8  seemingly uninvolved defendants fail to create any basis for liability, I sua sponte dismiss Ruiz-

9  Lee and Hammack from this lawsuit.[4]

10       b.   *Kallas is entitled to qualified immunity from the federal claims.*

11       The legal framework for Kallas is the same as it was for Brochu: I must determine

12  whether Kallas violated J.M. or I.M.'s constitutional or statutory rights and whether those rights

13  were clearly established at the time of the relevant events. *Ashcroft*, 563 U.S. at 765. Just as I

14  found *supra* subsection III(a)(2), by the date of J.M.'s placement with the Hernandezes in April

15  2012, it was "clearly established" that J.M. and I.M. had protected liberty interests in safe foster

16  care placement once the state took control over them. *Tamas*, 630 F.3d at 847. But I do not find

17  evidence that Kallas violated the children's constitutional rights; thus, she is entitled to qualified

18  immunity.

19       Neither party disputes that Kallas's involvement in this case is limited to the following:

20  on August 28, 2013, Kallas spoke with the biological mother of J.M. and I.M. to discuss the

21  mother's concerns about the burn on J.M.'s buttock. ECF No. 128 at 330. Kallas responded that

22  she would contact the Hernandezes for more info. *Id.* The next day, she called Andrea, who

23  misrepresented that J.M. had diaper rash and probably got the mark from playing on a Slip and

24  Slide. *Id.* at 331. Kallas requested that Andrea follow up with a doctor to confirm. *Id.* The

25

26  [4] A trial court may dismiss any claim sua sponte, without notice to the plaintiff, when it is clear that the plaintiff cannot possibly win relief. *Omar v. Sea-Land Serv., Inc.*, 813 F.2d 986, 991 (9th Cir. 1987) (citing Fed. R. Civ. P. 12(b)(6)).

children's mother followed up with Kallas on August 30 and requested proof that J.M. had a rash. *Id.* at 332. Kallas responded that diaper rash was consistent with their prior case notes and referred her to the CPS hotline if she wanted further investigation. *Id.* at 333. Beyond that, Hoy argues that as Brochu's supervisor, Kallas should have known of "the substandard performance of the [c]ounty workers assigned to [J.M. and I.M.'s] case and that she had "actual knowledge that J.M. and I.M.'s placement in the Hernandez foster home placed them at substantial risk." ECF No. 109 at 29. She argues that any reasonable official would have understood that their conduct violated the children's rights. *Id.*

But "immunity protects all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 580 U.S. 73, 79 (2017) (cleaned up). The evidence supports that Kallas was neither. Her actions—in attempting to identify the source of J.M.'s injuries and ultimately referring the children's mother to CPS hotline—seemed to comport with what a reasonable supervisor would have done in her position. As Hoy argues, the "question . . . is whether a reasonable official would have understood that her actions were violative of J.M. and I.M.'s constitutional rights." ECF No. 109 at 29. And Kallas would have had no reason to think so; from her perspective, Brochu's case notes indicated that the boys were doing well and that the burns were diaper rash. She had no reason to believe that Brochu was lying or misrepresenting her inspection of the minor children until she was contacted by their biological mother, at which point she took swift corrective action. Because Hoy cannot demonstrate that Kallas violated either of the children's constitutional rights, or otherwise knew of such a violation and failed to act, I grant Kallas qualified immunity on the substantive-due-process claim.

       *c.  I grant Kallas summary judgment on Hoy's negligence claim.*

Kallas's involvement—with respect to the cause of J.M. and I.M.'s injuries—is even more attenuated than Brochu's. I already found that Hoy could not support a finding of causation against Brochu due to the superseding cause of Andrea covering up her child's burning of J.M., and my reasoning is even stronger as applied to Kallas. Because Hoy has not provided any

evidence that Kallas's actions caused any injury to J.M. or I.M. or that Andrea's actions were foreseeable to Kallas, she fails to meet her burden on the causation element of negligence. Kallas is thus entitled to summary judgment on Hoy's negligence claim.

> d.   *I grant Clark County summary judgment on Hoy's substantive-due-process claim.*

Hoy seeks to hold Clark County liable under two theories of municipal liability for its employees' actions. ECF No. 1-2 at 12–14. To survive summary judgment, Hoy must assert that a specific county policy, practice, or custom violated J.M. or I.M.'s right to substantive due process. *See Momox-Caselis*, 987 F.3d at 844 (holding that a plaintiff failed to present a viable *Monell* claim against the county when they failed to do so). Hoy contends that Clark County failed to improve its foster-care system after receiving a series of scathing reviews from the federal government, as well as internally. ECF No. 1-2 at 5–6. She claims to have "identified official Clark County policies that were clearly inadequate in protecting J.M. and I.M." ECF No. 109 at 19. But she cites *alleged violations* of DFS policies as evidence of that claim. *Id.* The fact that Clark County seemed to have enacted policies for proper foster-care procedure, but Brochu violated them, contradicts the notion that any specific policy ratified Brochu's behavior. Hoy recognizes this and undercuts her own claim: "[m]uch of the [d]efendants' indifference . . . did not take the form of official policy decisions, but rather consistent widespread failures to comply with the stated policies." *Id.* at 23. But Hoy largely fails to specify which defendant(s) she claims violated those policies. ECF No. 109 at 20–23. Such generality belies the nature of Hoy's claim: she asserts that "defendants acted with deliberate indifference" when they failed to adhere to various DFS policies but fails to argue that theory with respect to any specific defendant or their specific actions. Hoy's arguments thus unfairly attribute the actions of Brochu to the other defendants in the case. Without specifics as to how the county itself was deliberately indifferent, summary judgment is appropriate.

      *e.*   *I grant Clark County summary judgment on Hoy's inadequate-training claim.*

Hoy also argues that *Monell* liability should be imposed against Clark County for failing to adequately train DFS employees. ECF No. 1-2 at 14–15. She argues that the county had obligations to train social workers and supervisors regarding investigations, licensing, supervision of foster parents, protection of foster children, and reporting of suspected abuse. *Id.* at 15. The county argues that Hoy fails to demonstrate any of the elements of such a claim. ECF No. 91 at 26.

A "municipal defendant can be held liable because of a failure to properly train its employees only if the failure reflects a 'conscious' choice by the government." *Kirkpatrick v. County of Washoe*, 843 F.3d 784, 793 (9th Cir. 2016). A plaintiff can satisfy this requirement by showing that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers . . . can reasonably be said to have been deliberately indifferent to the need." *Id.* (internal quotation marks and citation omitted).

Plaintiffs must present either a "pattern of similar constitutional violations by untrained employees" or they must show that the municipality "has failed to train its employees to handle recurring situations presenting an obvious potential for" constitutional violations. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). But a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985)). A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities[.]" *Id.* at 62 (citation omitted).

Hoy's allegations do not demonstrate a pattern of similar constitutional violations by untrained employees, nor do they demonstrate that the county failed to train its employees to handle situations involving child abuse. To the contrary, I have found that Hoy states a viable constitutional claim against Brochu only. To demonstrate a pattern of constitutional violations or widespread failure to train, Hoy would need to present evidence that other DFS employees engaged in constitutional violations or were untrained in dealing with abusive foster care

parents. But again, Hoy makes general arguments concerning the "defendants" as a whole rather than any specific individual(s) or county action(s). And when Hoy is specific, she neglects to identify how the county failed to train its employees. *See, e.g.*, ECF No. 109 at 22 ("Had [d]efendants Ruiz-Lee, Hammack[,] and Kallas properly trained and supervised their subordinates, it would have been apparent to [d]efendants that J.M. and I.M. were at substantial risk in the Hernandez foster home."). Even if Hoy's allegation that the defendants' indifference to the children's wellbeing "did not take the form of official policy decisions, but rather consistent widespread failures to comply with the stated policies" is true, she still fails to connect those failures to a pattern of constitutional violations within DFS.

   *f.   I deny Clark County summary judgment on Hoy's negligence claim.*

   To hold the county liable for negligence, Hoy must demonstrate that it (1) owed a duty of care to the children, (2) the county breached that duty, (3) the breach caused the children's injuries, and (4) the children suffered damages. *Scialabba*, 921 P.2d at 930. The county's duty to the children and the children's injuries are not in question. But the county asserts that the Hernandezes' criminal act (of child abuse) constitutes a superseding cause, such that any of its own actions cannot establish the element of causation. ECF No. 91 at 30. As mentioned *supra* subsection III(c), "an unlawful act will not supersede causation if it was foreseeable." *Anderson*, 358 P.3d at 248. While I find no genuine dispute that Brochu could not have foreseen the injuries to the children given the paucity of Hoy's allegations against her, the situation is different for the county.

   Hoy's negligence claim against the county is more expansive than her claim against Brochu; she alleges that the county breached its duty to J.M. and I.M. by failing to comply with regulatory provisions regarding the licensing process for foster homes, by failing to adequately supervise the children, by failing to adequately investigate the Hernandezes, and by placing the minor children at the Hernandez household. ECF No. 1-2 at 16. And she presents enough evidence to establish a genuine dispute as to whether the Hernandezes' actions were foreseeable

to Clark County, which had a greater wealth of information and a better perspective of the situation than Brochu did. The county does not provide any substantial argument that the Hernandezes' actions were *not* foreseeable. ECF Nos. 91 at 30, 122 at 29–30. Nevada law typically requires courts to consider several factors in determining whether an intervening cause is foreseeable. *Bower*, 215 P.3d at 725. But when the third party commits a crime, the "negligent party will only be liable if [they] knew or should have known at the time of the negligent conduct that [they were] creating such a situation and that a third party 'might avail himself of the opportunity to commit such a tort or crime." *Id.* (citing Restatement (Second) of Torts § 448 (1965)).

Hoy sufficiently alleges that the county should have known, at all times after 2010, that it created a situation in which the Hernandezes could have availed themselves of the opportunity to commit child abuse. She detailed at length the allegations of child abuse, neglect, and lack of cleanliness in the Hernandez household even before J.M. arrived. The county nonetheless issued a foster license to the Hernandezes for J.M. and I.M. Hoy also describes the inconsistencies across case workers and the circumstances surrounding the Hernandezes' unapproved move to Sandy Valley. The county, through its workers, had constructive knowledge of each of these events and still permitted the foster children to remain in the care of the Hernandezes. I thus deny summary judgment on Hoy's negligence claim against the county.

## V.   The Hernandezes' joinders to the defendants' motions for summary judgment (ECF Nos. 97, 98)

The Hernandezes seek to join the defendants' motions for summary judgment. ECF Nos. 97 (joining Brochu's motion), 98 (joining the county and DFS employees' motion). They request that I incorporate the other defendants' motions into their own motion for summary judgment "as if [they were] filed by" the Hernandezes. ECF Nos. 97 at 2, 98 at 2. But they add no new argument or citation to authority. *See generally* ECF Nos. 97, 98. To the extent that they seek to provide additional support to the moving defendants, such support is extraneous and irrelevant

to my disposition of the motions. And they cannot use the moving defendants' motions as bases to argue that they are entitled to summary judgment.

These attempts to join in the other defendants' motions misapprehend the purpose of summary judgment and the nature of the claims asserted against the Hernandezes. A defendant moving for summary judgment must demonstrate that there are no genuine disputes over facts material to the claims asserted against them and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving defendants provided statements of undisputed facts and argued that under those facts, they cannot be held liable. *See* ECF No. 90 at 5–18 (Brochu); ECF No. 91 at 9–30 (Clark County and other DFS employees). The Hernandezes, by joining the two motions for summary judgment, seem to thus agree with the moving defendants that the moving defendants should not be held liable. But that does nothing to dispel Hoy's claims against them; the other defendants do not argue that the Hernandezes should be awarded summary judgment, so the Hernandezes' proffered joinders wholly fails to address the claims against them.

While some courts permit defendants to join in other defendants' motions for summary judgment, such permission is sensical when "the [j]oining [d]efendants are in the same substantive position as the [m]oving [d]efendants themselves." *Robinson v. Vivendi Universal*, 2005 WL 5748318, at *7 (C.D. Cal. Nov. 22, 2005). But the Hernandezes and the moving defendants differ with respect to the substance of the claims asserted against them such that they are not in the same substantive position. Hoy brings two § 1983 claims against the county and DFS employees, one negligence claim against the county and DFS employees, and one negligence claim against the Hernandezes. ECF No. 1-2 at 12–18. Her negligence claim against the Hernandezes is based on a separate series of events and underlying facts than her negligence claim against the moving defendants; she asserts that the moving defendants breached their duty of reasonable professional judgment in carrying out their responsibilities under various state laws. *Id.* at ¶ 74. Her negligence claim against the Hernandezes, by contrast, stems from their alleged breach of the duty to act with reasonable care as foster parents to the minor

children. *Id.* at ¶ 79. Ultimately, the Hernandezes' joinders to the two motions for summary judgment create no legal basis for me to award them summary judgment, as the moving defendants do not argue that the Hernandezes should be granted summary judgment and the Hernandezes are not substantively similar enough to the moving defendants to benefit from the moving defendants' argument. I thus strike the Hernandezes' joinders to the other defendants' motions for summary judgment.

**VI.   Conclusion**

IT IS THEREFORE ORDERED that defendant Brochu's motion for summary judgment **[ECF No. 90] is GRANTED in part and DENIED as discussed in this order.** Brochu is entitled to summary judgment on Hoy's negligence claim against her. But Brochu cannot benefit from qualified immunity and is thus denied summary judgment on Hoy's substantive-due-process claim against her.

IT IS FURTHER ORDERED that defendants Clark County, Kallas, Ruiz-Lee, and Hammack's motion for summary judgment **[ECF No. 91] is GRANTED in part and DENIED in part as discussed in this order.** Ruiz-Lee and Hammack are dismissed from this lawsuit with prejudice. Kallas is entitled to qualified immunity from Hoy's substantive-due-process claim against her. I grant summary judgment in favor of Kallas on Hoy's negligence claim against her. Thus, Kallas is also dismissed from this lawsuit with prejudice. Clark County is granted summary judgment on the federal claims but is denied summary judgment on the negligence claim against it.

IT IS FURTHER ORDERED that the Hernandezes' joinders to the motions for summary judgment **[ECF Nos. 97, 98]** are **STRICKEN from the record.**

1  IT IS FURTHER ORDERED that the parties must attend a mandatory settlement

2  conference before the assigned magistrate judge as soon as practicable. If the parties fail to

3  settle, they are instructed to meet and confer regarding potential trial dates and the deadline for

4  the filing of a joint pre-trial order that conforms with this district's local rules, *see* LR 16-3, LR 16-

5  4, **within 30 days of the settlement discussions' conclusion.**

6  DATED: July 25, 2023

7

8  _____

9  Cristina D. Silva
   United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26